# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BANDERA MASTER FUND LP, BANDERA VALUE FUND LLC, BANDERA OFFSHORE VALUE FUND LTD., LEE-WAY FINANCIAL SERVICES, INC., and JAMES R. MCBRIDE, on behalf of themselves and similarly situated BOARDWALK PIPELINE PARTNERS, LP UNITHOLDERS, | § § § § § § § § § § § | No. 439, 2024<br><br>Court Below: Court of Chancery of the State of Delaware<br><br>C.A. No. 2018-0372 |
| Plaintiffs Below, Appellants, | § § § § | |
| v. BOARDWALK PIPELINE PARTNERS, LP, BOARDWALK PIPELINES HOLDING CORP., BOARDWALK GP, LP, BOARDWALK GP, LLC, and LOEWS CORPORATION, | § § § § § § § § § | |
| Defendants Below, Appellees. | § § § | |

Submitted: June 25, 2025
Decided: December 10, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW** and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

A. Thompson Bayliss, Esquire (*argued*), Daniel G. Paterno, Esquire, Eric A. Veres, Esquire, Samuel D. Cordle, Esquire, ABRAMS & BAYLISS, LLP, Wilmington, Delaware *attorneys for Plaintiffs Below, Appellants Bandera Master Fund LP, Bandera Value Fund LLC, Bandera Offshore Value Fund Ltd., Lee-Way Financial*

*Services, Inc., and James R. McBride, on behalf of themselves and similarly situated Boardwalk Pipeline Partners, LP Unitholders.*

Daniel A. Mason, Esquire, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP, Wilmington, Delaware; William Savitt, Esquire (*argued*), Sarah K. Eddy, Esquire, Adam M Gogolak, Esquire, Daniel B. Listwa, Esquire, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; Srinivas M. Raju, Esquire, Blake Rohrbacher, Esquire, Kyle H. Lachmund, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rolin P. Bissell, Esquire, YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, Delaware; Andrew G. Gordon, Esquire, Harris Fischman, Esquire, Robert N. Kravitz, Esquire, Carter E. Greenbaum, Esquire, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP, New York, New York, *attorneys for Defendants Below, Appellees Boardwalk Pipeline Partners, LP, Boardwalk Pipelines Holding Corp., Boardwalk GP, LP, Boardwalk GP, LLC, and Loews Corporation.*

Christopher B. Chuff, Esquire, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware, attorney for *amicus curiae the Opinion Bar Group Leaders*.

**TRAYNOR**, Justice, for the Majority:

In 2005, Loews Corporation formed Boardwalk Pipeline Partners, LP ("Boardwalk") as a publicly traded master limited partnership ("MLP"). Boardwalk operates natural gas pipelines through three subsidiaries. Loews formed Boardwalk to take advantage of a new Federal Energy Regulatory Commission ("FERC") policy that made MLPs attractive investment vehicles for pipeline-company investors. But Loews wanted the option of taking Boardwalk private again if FERC policy changed in a way that would have a material adverse effect on Boardwalk's rates. So the Boardwalk limited partnership agreement included a call-right provision that gave Boardwalk's general partner the right to acquire the public limited partners' interests if certain conditions were met.

In March 2018, FERC took a series of actions, including announcing a proposed regulatory policy, that could make MLPs less attractive for pipeline investors. The proposed policy was strenuously opposed by pipeline-industry participants. Boardwalk made a preliminary assessment that the policy, if adopted, would have a relatively neutral impact on the rates it charged its customers. Even so, Loews' general counsel engaged outside counsel to consider whether it could render an opinion—one of the conditions precedent to its general partner's exercise of the call right—that, by virtue of FERC's proposed policy change, it would be

reasonably likely that Boardwalk would suffer a material adverse effect on the rates it could charge its customers.

According to the Court of Chancery, it was far from self-evident that FERC's new regime, if adopted, would have a material adverse effect on Boardwalk's rates. Among other things, a critical input—how FERC would treat accumulated deferred income taxes or "ADIT"—was missing. And other variables, most notably whether Boardwalk would be subject to a rate case—that is, the procedure by which a pipeline's maximum rates are set—seemed more likely to cut against a conclusion that Boardwalk's rates would suffer a material adverse effect. Altogether more uncertainty surrounded whether the proposed policy would in fact be adopted and what form it would take.

The court also found that outside counsel set these concerns aside and issued its opinion nonetheless. And another law firm was enlisted to opine on the opinion's acceptability, which it did subject to certain qualifications. These two opinions in hand, Boardwalk's general partner announced that it was exercising the call right. Ten days later, the transaction closed. The day after that, FERC issued an order on rehearing of the revised policy and a final rule. Consistent with Boardwalk's preliminary assessment but contrary to the opinion of counsel, FERC's March 2018 actions would have no effect on Boardwalk's recourse rates.

Boardwalk unitholders sued the partnership and related entities, alleging that the general partner's exercise of the call right required the unitholders to sell their units to the general partner at what the unitholders claimed was a depressed price. A five-count amended complaint came later. The first two counts were for breach of contract against Boardwalk and its general partner, one for exercising the call right and the other for paying an artificially depressed price for the unitholders' units. The third count alleged a breach of the implied covenant of good faith and fair dealing by Boardwalk and its general partner. The remaining counts—tortious interference with contractual relations and unjust enrichment—named the general partner's sole member and the general partner's parent entities.

In December 2021, the Court of Chancery issued a post-trial opinion and entered a partial final judgment—confined to the first breach of contract count—in favor of the unitholders and against Boardwalk and its general partner. Among other findings, the court found that the opinion of counsel, which was a condition precedent to the general partner's exercise of the call right, had not been rendered in good faith. This meant that the condition failed and that, consequently, the general partner breached the partnership agreement when it exercised the call right. The court severed and stayed the remaining counts.

On appeal, this Court reversed the Court of Chancery's partial final judgment after determining that, under the partnership's governing documents, the general

5

partner was exculpated from monetary liability for breach of contract. We did not review the court's finding that the legal opinion had not been rendered in good faith. Nor did we address whether the general partner's exercise of the call right breached the partnership agreement. We remanded the case to the Court of Chancery for further proceedings and adjudication of the non-exculpated claims.

On remand, the Court of Chancery struggled with the implications of our decision but ultimately concluded that the remaining counts should be dismissed. The unitholders appealed. Because we have concluded that the Court of Chancery misapprehended the scope of our previous decision in a way that affected its analysis of claims that were neither adjudicated in the trial court's post-trial decision nor decided by this Court on appeal, we reverse its judgment and remand for further proceedings.

I

The facts of this case have been recounted at length in the Court of Chancery's post-trial opinion, our 2022 opinion, and the Court of Chancery's remand opinion.[1] We will not repeat them in granular detail here. Instead, we summarize as much of the factual and procedural background as is necessary to understand the issues now

---

[1] *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2021 WL 5267734 (Del. Ch. Nov. 12, 2021), *rev'd and remanded*, 288 A.3d 1083 (Del. 2022) [hereinafter *Post-Trial Opinion*]; *Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP*, 288 A.3d 1083 (Del. 2022) [hereinafter *Boardwalk 2022*]; *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2024 WL 4115729 (Del. Ch. Sept. 9, 2024) [hereinafter *Remand Opinion*].

6

before us and our reason for resolving them as we do. We provide additional color later as we address the parties' respective arguments.

A

At the beginning of 2005, Loews owned three natural gas pipelines. These pipelines ship gas from the shale basins of the Southern United States to end users, mostly large cities and natural-gas-fired power plants in the South and Midwest.

FERC closely regulates natural gas pipelines in ways that affect their profitability. In late 2005, FERC began allowing limited partnerships to include in their rate-making calculations a tax allowance for all their limited partners, regardless of whether each limited partner paid tax at the corporate level. This change made the limited partnership a fitting business structure for pipelines. Many restructured as limited partnerships. In 2005, Loews merged its pipeline assets into Boardwalk, which it took public. Boardwalk's corporate structure is as follows.

Boardwalk is a Delaware limited partnership.[2] Boardwalk's general partner is Boardwalk GP, LP (the "General Partner")—also a Delaware limited partnership. The general partner of the General Partner is Boardwalk GP, LLC (the "GPGP"). Boardwalk Pipeline Holdings Corp. (the "Sole Member") is the sole member of GPGP and is owned by Loews.[3] GPGP has a board of directors, consisting of four

---

[2] *Post-Trial Opinion*, 2021 WL 5267734, at *3.
[3] *Id*. at *9.

independent directors and four Loews insiders.  Through the Sole Member and its status as the sole member of the GPGP, Loews controls the General Partner, and thus Boardwalk.  Boardwalk is governed by the Third Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement").

Provisions of that agreement rest at the core of this dispute.  Loews, when forming Boardwalk in 2005, was concerned that FERC might reverse course and undo the tax policy that made the partnership structure attractive to pipelines and their investors.  So Loews included a call-right provision (the "Call Right") in Boardwalk's Partnership Agreement.  Under the Call Right, the General Partner could purchase all the common units of Boardwalk that the General Partner or its affiliates did not already own.  For the General Partner to exercise the Call Right, however, certain conditions had to be met.  Two of those conditions are relevant here.

First, Section 15.1(b) of the Partnership Agreement required that the General Partner receive:

> an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state, or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers" [4] [respectively, the "Opinion" and "Opinion Condition"].

---

[4] App. to Opening Br. at A1305 (Partnership Agreement § 15.1).

Second, the Partnership Agreement defined an "Opinion of Counsel" as "a written opinion of counsel . . . acceptable to the general partner." (the "Acceptability Condition").[5] It did not specify, however, which entity would act through the General Parter in making the acceptability determination.

B

FERC regulates the interstate transmission and wholesale sale of electricity, natural gas, and oil. Every price that a pipeline charges a customer for gas shipment, also known as a "rate," must be on file with FERC.[6] In markets where a pipeline holds a monopoly over shipment, FERC calculates and sets the maximum rate that pipelines can charge based on the cost of service that the pipeline incurs. Customers are free to negotiate a lower rate with a pipeline and often do, particularly in regions where pipelines compete with one another. Yet customers can always fall back to paying the FERC-calculated maximum rate.[7] This rate is known as a "recourse rate."

The Natural Gas Act requires FERC to set "just and reasonable rates."[8] "[J]ust and reasonable" is considered in the context of a pipeline's profitability.[9] That is, a just and reasonable rate is one that allows for a reasonable return on investment.[10]

---

[5] *Id*. at A1218 (Partnership Agreement § 1.1).
[6] 18 C.F.R. § 154.1.
[7] *Post-Trial Opinion*, 2021 WL 5267734, at *4.
[8] 15 U.S.C. § 717c.
[9] *Boardwalk 2022*, 288 A.3d at 1088.
[10] *Id.*

9

If rates are too high, the pipeline would receive an inappropriately high rate of return. If, on the other hand, rates are too low, the pipeline would not generate a fair return for investors. This rate analysis differs for each pipeline, as cost of operations vary. FERC is required to consider the entire picture, so to speak, when calculating rates. Determining or changing rates based on a single category of cost—known as "single-issue ratemaking"—is prohibited.

To change rates, someone, usually a shipper or FERC, must initiate a rate case alleging excessively high rates. FERC completes a cost-of-service calculation and then publishes new recourse rates. Pipelines with a lower return on investment are relatively unlikely to face a rate case as FERC pursues pipelines with higher returns. Taxes, too, play a role in FERC's determination of what constitutes a reasonable rate. An increase in taxes paid by a pipeline likely indicates a higher rate should be allowed so that the pipeline can maintain a reasonable return on investment, as taxes make up part of the cost of service determination. A change in FERC tax policy can significantly affect pipeline profitability.

C

Until 2018, FERC allowed MLP pipelines an income tax allowance for all limited partners. FERC used this tax allowance when calculating recourse rates. MLP like Boardwalk are subject to pass-through taxation and non-corporate partners do not pay corporate-level income tax. Yet the pipelines still received a tax

10

allowance as if all partners did. This tax policy is what drove pipelines to restructure as limited partnerships in 2005. By receiving an allowance in the ratemaking process that calculated their taxes as higher than actual taxes paid, pipelines could increase their FERC-approved rates and deliver increased returns. Boardwalk went public as a limited partnership to take advantage of this policy.

The Call Right provision was included in Boardwalk's Partnership Agreement because FERC policy changes can have material effects on rates, and thus profitability. In 2016, in *United Airlines v. Federal Energy Regulatory Commission*, the United States Court of Appeals for the District of Columbia Circuit held that the corporate-income-tax allowance for limited partnership pipelines unfairly discriminated against unitholders of pipelines, as both individual limited partners and corporate limited partners received the same tax allowance yet were taxed at different rates.[11] This decision prompted FERC to propose a policy change in 2018.

On March 15, 2018, FERC issued the Revised Policy Statement (the "Policy Statement"). The Policy Statement announced that MLP pipelines would no longer be permitted to claim an income tax allowance when calculating their costs of service. FERC also issued a notice of inquiry ("Notice of Inquiry"), requesting

---

[11] 827 F.3d 122, 134 (D.C. Cir. 2016).

11

comment on the agency's future treatment of "Accumulated Deferred Income Tax" ("ADIT") balances.[12]  Next, we provide a brief description of ADIT balances.

Federal tax law allows pipelines to benefit from accelerated depreciation.  But FERC uses straight-line depreciation when calculating rates.  Therefore, when pipelines employ accelerated depreciation, their taxes are lower than FERC predicts for ratemaking purposes, resulting in an increase in cash flow for the pipeline.  This unexpected increase is accounted for as "ADIT."  Then, at the end of the accelerated depreciation period, the pipeline's taxes exceed FERC's expectations, and those taxes reduce the pipeline's ADIT balance.  ADIT becomes, essentially, cost-free capital.[13]  At issue in the Notice of Inquiry was how to address these ADIT balances.  Pipelines thought that the ADIT balance should be eliminated.  If eliminated, pipeline assets would increase, and pipelines could then ask FERC to approve increased rates to match their enlarged asset bases.  Shippers would argue the opposite.  As of the issuance of the Notice of Inquiry, no one knew how FERC would treat ADIT.  Accompanying the March 2018 Policy Statement was a Notice of Public Rulemaking ("NOPR"), which specified a method for pipelines to use when

---

[12] We refer to the March 15, 2018 FERC Revised Policy Statement and Notice of Inquiry collectively as the "2018 FERC Actions."
[13] *Post-Trial Opinion*, 2021 WL 5267734, at \*6.

calculating the impact of these new rules on their margins and submitting that information to FERC.[14]

D

The 2018 FERC announcement sent shock waves through the oil and gas industry. Investors worried about pipeline profitability. Many companies, including Boardwalk, rushed to analyze the impact of the changes and reassure investors. To calculate the impact of the changes on Boardwalk, Boardwalk's Vice President of Rates and Tariffs Ben Johnson consulted a recently performed analysis of Boardwalk's revenues. He concluded that the rates of Gulf Crossing and Gulf South, two of Boardwalk's three pipelines, were "relatively protected" from the changes.[15] The Gulf pipelines charged mostly negotiated rates, meaning that a change in the FERC-calculated recourse rates would have little impact on profitability. Johnson estimated that Texas Gas, Boardwalk's third pipeline, would be largely protected from challenges to its rates. It served a competitive market; most of its rates, too, were negotiated or discount rates, and FERC, due to resource constraints, was unlikely to file a rate case against Texas Gas in the next few years. Johnson also

---

[14] At the same time, FERC issued a decision against SFPP L.P., the pipeline defendant in the *United Airlines* case. FERC held that SFPP could not receive an income tax allowance and would have to alter its rates accordingly. *See SFPP, L.P. v. FERC*, 967 F.3d 788, 792 (D.C. Cir. 2020).
[15] App. to Answering Br. at B148.

13

noted that FERC's treatment of ADIT was a key factor in determining the impact of the regulations, and neither he nor anyone else could say what FERC would do with ADIT balances.

Armed with this information, Boardwalk began drafting a press release to provide investors with Boardwalk's understanding of the impact of the regulatory developments. During drafting, Boardwalk executives believed that Boardwalk's pipelines would not suffer rate changes and that the elimination of the income tax allowance would not result in a material impact on Boardwalk's rates. Boardwalk executives simultaneously fielded inquiries from Loews leadership and a GPGP Board director on the impact of the regulations.

In response, Boardwalk's Chief Financial Officer Jamie Buskill emphasized (1) the importance of negotiated and discount rates to Boardwalk's revenues, (2) the presence of a rate moratorium on Gulf South, and (3) that only 20% of Texas Gas revenues came from recourse rates. An internal Loews analysis on the impact of the regulations indicated that the uncertain ADIT treatment issue had the potential to be the "a-bomb outcome."[16] Even so, immediately following the FERC announcement, two Boardwalk executives, both of whom had an interest in succeeding Stan Horton as CEO of Boardwalk, separately emailed Loews and suggested exercising the Call Right.

---

[16] App. to Opening Br. at A186.

14

As noted earlier, exercising the Call Right was contingent upon receipt of an opinion of counsel, acceptable to the general partner, that the FERC actions were reasonably likely to have a material adverse effect on Boardwalk's maximum applicable rates. Marc Alpert, Loews' general counsel, contacted Mike Rosenwasser, then a partner at the law firm of Baker Botts, to see if Rosenwasser could give the necessary opinion. Rosenwasser was a leading MLP attorney, who, while practicing at Vinson & Elkins in 2005, had drafted the Call Right provision. Rosenwasser assembled an opinion committee from his Baker Botts partners and began the Call Right analysis.

At the end of March 2018, as Rosenwasser's analysis proceeded, Loews injected itself into Boardwalk's effort to draft the press release. Loews knew that its ability to exercise the Call Right depended on whether Boardwalk's tax status would have a "material adverse effect on the maximum applicable *rate* that can be charged to customers."[17] As initially drafted, the press release stated that the FERC actions were unlikely to have an adverse impact on Boardwalk's *rates*; Loews changed it to instead address the likely impact on Boardwalk's *revenues*. Loews also removed language indicating that the FERC decision would have minimal impact on Boardwalk's rates. At publication, the headline of the press release read:

---

[17] *Id*. at A1305 (Partnership Agreement § 15.1(b)) (emphasis added).

"Boardwalk Does Not Expect FERC's Proposed Policy Revisions To Have A Material Impact On *Revenues*."[18]

Alpert, still concerned that publication of the press release could affect the Call Right exercise, arranged a call with Rosenwasser and other Baker Botts attorneys. He asked about the press release and whether the FERC actions were, in the Court of Chancery's words, "sufficiently concrete to enable Baker Botts to issue the Opinion?"[19] The following day, Baker Botts advised Loews that, because the release focused on revenues and not rates, it did not present problems for the Call Right analysis. On the opinion question, though, Greg Wagner, a Baker Botts partner whose practice focused on FERC matters, explained that the FERC actions were not final and in any event likely would not affect Boardwalk's rates. When Alpert, concerned by Wagner's comments, called Rosenwasser moments later, Rosenwasser said, "we're already there[,]" indicating he believed that Baker Botts would still be able to deliver the opinion.[20]

F

To conclude that the Call Right had been triggered, Rosenwasser developed an analytical framework that the Court of Chancery likened to a "syllogism."[21] The

---

[18] *Post-Trial Opinion*, 2021 WL 5267734, at *19 (citing Joint Trial Exhibits at 615 [hereinafter JX]) (emphasis added).
[19] *Id.* at *20.
[20] *Id.* at *21.
[21] *Remand Opinion*, 2024 WL 4115729, at *6 (citing JX 639 at 1).

premises of the syllogism were that a pipeline's rates are based on cost of service and that the income tax allowance is part of the cost-of-service calculation. From these premises, Rosenwasser concluded that the elimination of the income tax allowance would result in a lower cost of service and thus have a material adverse effect on Boardwalk's maximum applicable rates.

Wagner recorded the following notes as Rosenwasser explained his syllogism:

1 – A pipeline charges COS [cost-of-service] rates

2 – Cos includes ITA [income tax allowance]

[No] ITA -> material effect

No examination of FERC actions/shipper actions
COS/over/under-recovery

Just saying [no] ITA = lower COS

= MAE on max applicable rates[22]

As the Court of Chancery noted, embedded in the syllogism was "the view that the Call Right was not concerned with the economic impact [of the FERC actions] on Boardwalk; it was only concerned with the abstract concept of 'maximum applicable rates.'"[23] And as will be discussed in more detail later, the syllogism elided various factors other than the elimination of the income tax

---

[22] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B476 (JX 639).
[23] *Post-Trial Opinion,* 2021 WL 5267734, at *21 (citing JX 679).

allowance (for example, rate-case risk and ADIT) that would affect Boardwalk's rates. It embraced, moreover, the dubious notion that a change in the cost-of-service variable, without consideration of other variables, would necessarily result in a material adverse effect on rates.

In an effort ostensibly designed to predict the effect of the March 2018 FERC Actions on Boardwalk's rates, Johnson, who had provided the preliminary analysis indicating that Boardwalk's rates would be "relatively protected," provided financial data in support of the emerging Baker Botts opinion.[24] Johnson performed both a "Form 501-G Analysis"[25] and a "Rate Model Analysis," two methods of providing concrete financial data analyzing the theoretical impact of the changes on Boardwalk's cost of service.[26] In the Form 501-G analysis, Johnson addressed each pipeline's cost of service at each FERC-specified tax rate— 35%, 21%, or no tax allowance at all. Johnson addressed ADIT using the "Reverse South Georgia" method, which assumed that the pipelines would be required to return the ADIT balance to ratepayers over a pipeline's lifetime. Although this was one plausible method that FERC could use to address ADIT, pipelines and shippers were lobbying

---

[24] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11 at A3623 (JX 572) (Johnson emails).
[25] The March 2018 FERC Actions included instructions for pipelines to complete a Form 501-G filing. Therein, pipelines would submit calculations projecting the impact that the Actions would have on their operations. Intake of the 501-G Forms would allow FERC to better understand how the 2018 Actions would affect pipelines.
[26] *Post-Trial Opinion*, 2021 WL 5267734, at *24 (citing JX 727 at 4).

FERC in opposing directions, and what FERC would do with ADIT was unknown. Johnson's 501-G analysis did not complete a revenue calculation, which would have shown that both Gulf pipelines were under-recovering cost of service and so were unlikely to see a rate case filed against them.

The Rate Model Analysis was like the 501-G analysis. For the 501-G calculations, Johnson used the FERC-provided return on equity ("ROE") of 10.55%. For the Rate Model, Johnson used an ROE of 12%, in the Vice Chancellor's words, "not an unreasonable" selection that Johnson found in an industry-specific report.[27] The variation in ROEs suggests that Boardwalk "did not think that the March 15 FERC Actions necessarily would be implemented as proposed."[28]

Baker Botts brought in their own FERC expert, Barry Sullivan, to analyze Johnson's work for Boardwalk. Sullivan first described the Rate Model Analysis as "not a recourse rate calculation," because the Rate Model showed that removing the income tax allowance reduced cost of service and thus reduced rates.[29] It was not, however, conducted in the holistic way that FERC conducts ratemaking.[30]

The Rate Model Analysis also did not address the likelihood of a rate case. While Johnson's calculations were based on the Reverse South Georgia ADIT

---

[27] *Id.*

[28] *Id.*

[29] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11 at A5559 (JX 1735) (Sullivan Dep.).

[30] *Post-Trial Opinion*, 2021 WL 5267734, at *24 (citations omitted).

assumption, Baker Botts attorneys grew uncomfortable with the lingering uncertainty surrounding how ADIT would be treated. Wagner, Baker Botts' FERC-focused partner, "regularly wrestl[ed] with the uncertainty generated by how FERC would treat ADIT."[31] Wagner also noted the distinction between the cost-of-service calculations that Johnson had completed and an actual rate analysis—the same distinction noted by longtime FERC employee Sullivan.

Sullivan understood that Johnson's analysis calculated the change in cost of service if FERC eliminated the income tax allowance.[32] Sullivan, when asked by Wagner, continued to specify the difference between the cost-of-service calculations completed by Boardwalk and the rate analysis that Baker Botts was conducting. Sullivan explained that the analysis Johnson conducted, calculating the "indicative rate," was "meaningless" for several reasons.[33]

Sullivan explained that a rate calculation must include every variable, and that changing only the income tax allowance does not provide an accurate picture of future rates, as FERC would necessarily consider the entire picture when calculating rates. The Texas Gas and Gulf South pipelines had submitted to FERC several hundred pages of calculations supporting their latest recourse rate determinations. Johnson's Rate Model Analysis took just five pages per pipeline and did not consider

---

[31] *Id.* at *32 (citations omitted).
[32] *Id.* at *25.
[33] *Id.* at *65 (quoting Sullivan Dep. at 101).

several factors that Boardwalk's pipelines incorporated into their actual rate analyses. Johnson projected a cost-of-service reduction but could not necessarily predict a rate reduction. Lastly, for FERC-approved rates to change, a rate case would have to be initiated and won. Johnson's analysis did not address the likelihood of a rate case being brought, much less the likelihood of FERC or the shipper winning the case. On a call with Loews, Sullivan concluded that the likelihood of a rate case against Texas Crossing was low. The likelihood of a rate case being brought against the Gulf pipelines was so remote as not to bear mentioning.

G

In the second week of April 2018, Alpert, upon Rosenwasser's recommendation, hired Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Skadden was to both advise on whether the general partner should deem the Baker Botts opinion acceptable—the second condition necessary for exercise—and to "shadow Baker Botts' work."[34] Skadden corporate partner Richard Grossman led the effort, while litigator Jennifer Voss advised on matters of Delaware law. The firm's initial inquiry focused on identifying which entity at the General Partner level should make the acceptability determination. Baker Botts, meanwhile, struggled

---

[34] App. to Opening Br. at A326.

with the "material adverse effect" component of the opinion and sought Skadden's help.

Skadden, as a matter of firm policy, does not render opinions on whether an event constitutes a material adverse effect. In response to Baker Botts' inquiry regarding the material-adverse-effect issue, Skadden attorneys were unsure that a 10-15% change in maximum applicable rates would constitute a material adverse effect. Skadden thought that a more fact-intensive inquiry was needed, beyond Rosenwasser's abstract syllogism, to determine whether Delaware's material adverse effect standard had been met. When Grossman refused to support the desired material-adverse-effect conclusion, Alpert grew angry. Boardwalk executive Tom Watson emailed Alpert about Skadden's refusal to wade in to the fray, stating that, "If people think the language says that the relevant test is what is the *real world effect*, then we have an issue. I think it's crystal clear that we're talking *hypothetical* future max FERC rates[,]"[35] meaning that the material adverse effect bar could only be met under the hypothetical rates of Rosenwasser's syllogism, not by the "real world effect" of FERC's actions.[36]

Grossman asked Mike Naeve, a Skadden partner and former FERC commissioner, to speak with Baker Botts about the material-adverse-effect issue.

---

[35] *Id.* at A396.
[36] *Id.* at A354.

When he did, Naeve immediately noted the importance of analyzing the likelihood of a rate case being brought. Without a rate case, recourse rates would not change, making the likelihood that such a case would materialize crucial in determining the effect any regulatory change would have on rates. Naeve also raised the importance of negotiated rates, discount rates, and rate moratoria in the material-adverse-effect analysis. All three affect the likelihood of a rate case being brought. Baker Botts, however, concluded that because pipelines are "long-lived assets" and the Call Right provision specified "material adverse rate effects *in the future[,]*" the firm need not consider discounted rates or rate moratoria expected to expire in the next few years.[37]

Despite the issues identified by both Baker Botts and Skadden's resident FERC practitioners, Loews wanted a draft opinion by the end of April. Rosenwasser decided not to consider the real-world factors identified above, describing them as "speculation" about rates.[38] Of note is how draft versions of the opinion addressed the rate-case-likelihood issue in different ways.

The April 4 draft assumed that the pipelines would file rate cases, resulting in the pipelines charging the newly reduced recourse rates, thus generating a material adverse effect. The April 4 draft did not explain why pipelines would bring rate cases that would result in lower rates, an action opposed to their interests.

---

[37] *Id.* at A574.
[38] *Post-Trial Opinion*, 2021 WL 5267734, at *30.

23

Recognizing this inconsistency, in an April 17 draft, Baker Botts removed the April 4 provision and instead assumed the pipelines would charge recourse rates, effectively declining to address the likelihood of a rate case in the draft opinion.

The Baker Botts partners further "questioned whether Baker Botts should be giving an opinion under Delaware law about the existence of a material adverse effect"[39] and wanted to rely on Skadden's work on the issue. Frustrated by Skadden's refusal to provide work product that could be relied upon, Rosenwasser turned to Richards, Layton & Finger, PA ("Richards Layton"), an established Delaware law firm with extensive corporate-law experience.

Rosenwasser appeared to be caught between his law partners, who were hesitant about various essential elements of the opinion, and his client Loews and its desire to exercise the Call Right. He contacted Richards Layton partner Srinivas Raju seeking assistance with the material-adverse-effect issue, and told Raju that a FERC expert predicted decreases of 12.19%, 11.70%, and 15.62% for the "top line revenue[s]" of Texas Gas, Gulf South, and Gulf Crossing respectively.[40] In reality, those numbers reflected changes in cost of service as reflected in Johnson's Rate Model Analysis. Recall that FERC expert Barry Sullivan did not consider Johnson's calculations to be a rate analysis. Rosenwasser then asked Richards Layton whether

---

[39] *Id.*

[40] *Id.* at *33 (citing JX 975 at 1).

24

an adverse effect exceeding 10% would constitute a material adverse effect under Delaware law. Raju found little caselaw in favor of or against the position Rosenwasser advocated and concluded he would have a "hard time saying [12% in perpetuity is] not material."[41] Richards Layton's support quelled some of the Baker Botts partners' concerns.

H

Loews wanted a commitment from Rosenwasser that Baker Botts would be able to deliver the opinion by April 20, and on that date, Rosenwasser sent a preliminary opinion to Alpert. This preliminary opinion was "substantially the same" as the final opinion delivered on June 29.[42] Baker Botts' final opinion mirrored the language of the Call Right, advising that the firm believed the partnership's tax status was reasonably likely to have a material adverse effect on the maximum applicable rate that the pipelines could charge.

As Baker Botts submitted its preliminary opinion to Loews, Boardwalk published its public comments on the NOPR, stating that:

> Until the Commission provides a final decision on the treatment of ADIT, Boardwalk cannot correctly assess the impact of the Revised Policy Statement and ADIT on its pipelines' costs of service, and any response in the Form No. 501-G will be misleading and inaccurate.[43]

---

[41] *Id.* at *34 (quoting JX 1007 at 1).
[42] *Remand Opinion*, 2024 WL 4115729, at *10.
[43] *Post-Trial Opinion*, 2021 WL 5267734, at *37 (quoting JX 1139 at 14).

Thus, although Boardwalk disclosed publicly that it could not calculate the impact of the changes on cost of service without an answer to the outstanding ADIT question, Baker Botts' preliminary opinion rested on reasoning that assumed a calculable change in cost of service. In his notes, Rosenwasser double-starred and underlined this text from the public comment. Skadden Wilmington litigator Voss described the section as "relatively unhelpful"[44] in an email.

Boardwalk, in the same comment filing, objected to FERC's instruction that the pipelines in Form 501-G calculate changes to cost of service based solely on tax allowance changes, as this, in Boardwalk's view, was single-issue ratemaking. Rosenwasser's syllogism, however, relied upon changes to cost of service based solely on the loss of the income tax allowance. In the same comments, Boardwalk pointed out the preliminary nature of the March 2018 FERC Actions. Baker Botts' preliminary, and later final, opinions treated the changes as binding. Lastly, Boardwalk's comments noted that Gulf South's rate moratorium meant that the changes could have no impact on that pipeline until the end of the moratorium in 2023, a fact not addressed in the preliminary opinion. The trial court concluded that "[t]hrough these comments, Boardwalk destroyed the basis for the Baker Opinion."[45]

---

[44] *Id.* (citing JX 1207 at 1).
[45] *Remand Opinion*, 2024 WL 4115729, at *13.

On April 30, 2018, Boardwalk and Loews filed Form 10-Qs. Each form disclosed the potential that the general partner would exercise the Call Right.[46] Over time, given the backward-looking pricing formula of the Call Right, Boardwalk's share price slowly dropped. With both a preliminary opinion and a commitment from Skadden on the acceptability conclusion in hand, Loews prepared to exercise the Call Right.

I

On May 24, 2018, the initial plaintiffs filed suit. The Call Right's pricing formula specified that the price paid by the general partner would reflect a historical average of the stock's trading price. Thus, because Loews' announcement regarding a potential Call Right exercise had over time driven the share price down, the initial plaintiffs sought to prevent inclusion of some of those lower prices within the 180-day price window included in the Call Right provision. At the same time, the general partner wanted a release from claims relating to call right exercise. Eighteen days after that lawsuit was filed, the parties agreed on a pricing formula Loews could use and, on June 22, 2018, the parties filed a stipulation of settlement. That is the same settlement later objected to by Bandera and rejected by the Court of Chancery.

On June 29, 2018, Baker Botts delivered the final opinion to Loews, an opinion substantially the same as the preliminary opinion provided two months

---

[46] Later in this opinion, we refer to these disclosures as the "Potential Exercise Disclosures."

27

earlier. The opinion did not cite any cases or statutes. It began by identifying the materials Baker Botts had consulted. It then provided its conclusion:

> On the basis of the foregoing, and subject to the assumptions, limitations, and qualifications set forth herein, we are of the opinion that the status of the Partnership as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by subsidiaries of the Partnership that are regulated interstate natural gas pipelines [the "subsidiaries"]. . . .[47]

After the conclusion, the opinion summarized Johnson's supporting financial data, stating that his financial data included calculation of "the estimated cost of service" of the subsidiaries.[48] This section went on to assume that "each subsidiary would charge all its customers the maximum applicable rate." And it concluded that the data showed that removal of the income tax allowance would result in an over ten percent reduction in maximum applicable rates. The final opinion explicitly assumed as part of its reasoning that the Revised Policy would not later be amended by FERC.

Upon receiving the opinion from Baker Botts, the Loews board recommended that the Sole Member exercise the Call Right. The Sole Member board met and Skadden delivered the final version of its ongoing work, a recommendation to the Sole Member board stating that "it would be within the reasonable judgment of [the

---

[47] App. to Opening Br. at A1521.
[48] *Post-Trial Opinion*, 2021 WL 5267734, at *48.

28

Sole Member] to find" the opinion acceptable.[49] The Sole Member board approved resolutions concluding that the opinion was acceptable and exercising the Call Right. Ten days later, on July 18, 2018, the transaction closed, with the General Partner purchasing all outstanding units at a price of $12.06 per unit, around $1.5 billion in total.

On July 18, mere hours after the transaction closed, FERC issued an order on rehearing of the revised policy and a final rule resulting from the agency's original notice on public rulemaking. The order on rehearing provided that, although MLPs would no longer automatically receive an income tax allowance when calculating costs of service, they would be allowed to argue in favor of a tax allowance when contesting a rate case. The agency further announced that pipelines could eliminate their ADIT balances and return none of the ADIT balance to ratepayers. The July 18 announcement saw FERC also modify Form 501-G, such that pass-through entities that did not receive an income tax allowance in cost-of-service calculations would be allowed to eliminate their ADIT balances.[50] When considered together, these decisions meant that the FERC Actions would have no ascertainable effect on Boardwalk's recourse rates. In fact, when Wagner emailed a summary of the final

---

[49] *Id.* at \*50 (citing JX 1518 at 23).
[50] *Boardwalk* 2022, 288 A.3d at 1090. FERC concluded that to eliminate the income tax allowance but maintain the ADIT balance would be prohibited under the retroactive ratemaking doctrine. FERC is barred from engaging in retroactive ratemaking by D.C. Circuit caselaw.

FERC determinations to Rosenwasser, Alpert, and Boardwalk executive McMahon, he concluded that the changes had the effect of "*reducing* the pipeline's exposure to rate reductions."[51]

J

The appellants, who we refer to as "Bandera" or "the plaintiffs," objected to the settlement reached between Loews and the initial plaintiffs. The Vice Chancellor rejected the proposed settlement and allowed Bandera to take over for the initial plaintiffs. Bandera then filed an amended complaint, alleging that Boardwalk and the General Partner breached the Partnership Agreement and violated the implied covenant of good faith and fair dealing when the General Partner exercised the Call Right. Bandera also alleged tortious interference and unjust enrichment against GPGP, the Sole Member, and Loews.[52]

After a four-day trial, the Court of Chancery found that the Baker Botts opinion was rendered in bad faith and that the GPGP board, and not the Sole Member, was the appropriate entity to make the acceptability determination. Thus, according to the court, neither the Opinion Condition nor the Acceptability Condition had been met. The Vice Chancellor also found that the scienter of Baker Botts could be imputed to the General Partner, rendering the exculpatory provision

---

[51] *Post-Trial Opinion*, 2021 WL 5267734, at *50 (citing JX 1578 at 1) (emphasis added).
[52] Henceforth, we refer to the defendants collectively as "the Boardwalk defendants."

30

of the Partnership Agreement inapplicable. The Court of Chancery awarded $689,827,343.38 in damages, pre- and post-judgment interest on that amount, and fees.

## K

To frame our discussion of the issues now on appeal, we review certain essential bases of the Court of Chancery's post-trial decision, its partial judgment consistent with that decision, our 2022 opinion resolving the appeal from that partial judgment, and how the Court of Chancery interpreted and applied our opinion on remand.

### (i)

The Court of Chancery's post-trial decision "perceived that exercising the Call Right involved three steps."[53] The first step was "satisfying the Opinion Condition," that is, securing "an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state, or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers."[54] Boardwalk purported to satisfy this condition through

---

[53] *Remand Opinion*, 2024 WL 4115729, at *35.
[54] App. to Opening Br. at A1305.

the Baker Botts opinion. The second step was "satisfying the Acceptability Condition," which required the General Partner to determine that the Opinion of Counsel was acceptable.[55] Boardwalk contended that the Sole Member's acceptance of the Baker Botts opinion based on Skadden's advice satisfied this condition. The third step was "making the decision to exercise."[56]

The Court of Chancery concluded that the General Partner—Boardwalk GP, LP—breached the Partnership Agreement by exercising the Call Right without satisfying either the Opinion Condition or the Acceptability Condition. Its summary of these conclusions and their consequences suffice for present purposes:

> . . . The *Post-Trial Opinion* found that the law firm had not rendered the opinion in subjective good faith but rather to reach the outcome Loews wanted. The *Post-Trial Opinion* therefore held that the General Partner breached the Partnership Agreement by exercising the Call Right without satisfying the Opinion Condition.
>
> The *Post-Trial Opinion* also held that the General Partner breached the Partnership Agreement by exercising the Call Right without satisfying the Acceptability Condition. The trial court held that the Partnership Agreement was ambiguous regarding which of the two internal decision-makers at the General Partner would make the acceptability determination. Applying the doctrine of *contra proferentem*, the *Post-Trial Opinion* resolved the ambiguity in favor of the limited partners. That meant the wrong General Partner decision-maker made the acceptability determination, resulting in a breach of the Partnership Agreement when the General Partner exercised the Call Right without satisfying the Acceptability Condition.

---

[55] *Remand Opinion*, 2024 WL 4115729, at *35.
[56] *Id*.

The plaintiffs had pursued alternative theories of recovery against the General Partner and other defendants. The adjudicated claim sufficed to support an award of damages, and the plaintiffs were only entitled to one recovery, so the *Post-Trial Opinion* did not reach the plaintiffs' other theories.[57]

Consistent with this adjudication, the court entered a "partial Final Judgment Pursuant to [Court of Chancery] Rule 54(b),"[58] entering judgment "in favor of the plaintiff class and against the General Partner in Count I of the amended complaint. . . ."[59] The order of partial final judgment recited that the court "ha[d] not resolved the plaintiffs' claims for breach of the Call Right exercise price formula (Count II), breach of the implied covenant of good faith and fair dealing (Count III), tortious interference with contractual relations (Count IV), or unjust enrichment (Count V)[.]"[60]

(ii)

In their appeal of the Court of Chancery's post-trial opinion and resulting partial judgment, the Boardwalk defendants raised four arguments. First, they challenged the court's finding that Bakers Botts had not rendered its opinion in good

---

[57] *Id*. at *2.
[58] In pertinent part, Court of Chancery Rule 54(b) provides: "When more than 1 claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, the Court may direct the entry of a final judgment upon 1 or more but fewer than all of the claims or parties only upon an express determination that there is not just reason for delay and upon an express direction for the entry of judgment." *See* Ct. Ch. R. 54(b).
[59] *Bandera Master Fund, LP v. Boardwalk Pipeline Partners, LP,* Del. Ch. 2018, No. 2018-0372, D.I. 287 (Partial Final Judgment Pursuant to Rule 54(b) and Order Staying Partial Final Judgment).
[60] *Id*.

faith.    Second, the defendants argued that the court had misinterpreted the Partnership Agreement when it determined that the Sole Member did not have the power to determine the acceptability of the Baker Botts opinion.    Third, the defendants contended that the court erred in its construction and application of the Partnership Agreement's exculpation provisions.    And finally, the defendants argued that the court erred in assessing damages.

(iii)

Just as the Court of Chancery confined its judgment to Count I of the operative complaint—one of two breach of contract claims against Boardwalk and the General Partner—on appeal, we trained our attention on that count.    More particularly, we focused on whether the General Partner was exculpated from monetary liability under Section 7.8(a) of the Partnership Agreement.    That provision provides that

> [n]otwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Partnership, the Limited Partners, the Assignees or any other Persons who have acquired interests in the Partnership Securities, for losses sustained or liabilities incurred as a result of any act or omission of an Indemnitee unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, the Indemnitee acted in bad faith or engaged in fraud, willful misconduct or, in the case of a criminal matter, acted with knowledge that the Indemnitee's conduct was criminal.[61]

---

[61] App. to Opening Br. at A1278.

Also relevant to our consideration of this issue was Section 7.10(b) of the Partnership

Agreement, which provides that

> [t]he General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion (including an Opinion of Counsel) of such Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such advice or opinion.[62]

We disagreed with the Court of Chancery's application of these provisions as

summarized above. We encapsulated our holding in the following statement:

> [T]he sole member was the correct entity to determine the acceptability of the opinion of counsel . . . . [T]he sole member, as the ultimate decisionmaker who caused the general partner to exercise the call right, reasonably relied on Skadden's opinion, and . . . the sole member and the general partner are therefore conclusively presumed to have acted in good faith in exercising the call right. Thus, the general partner and others were exculpated from damages under the Partnership Agreement. We reverse the Court of Chancery's judgment and remand for further proceedings consistent with this opinion. *We do not address any other arguments on appeal*.[63]

Thus, we did not decide whether the Opinion of Counsel Condition had been

satisfied or, whether, had that condition failed, the General Partner's exercise of the

Call Right breached the Partnership Agreement. Our exculpation holding as to the

General Partner rendered consideration of these issues unnecessary. This left

---

[62] *Id.* at A1280.
[63] *Boardwalk 2022*, 288 A.3d at 1088 (emphasis added).

standing Counts II through V of the complaint, which the trial court had severed and stayed. In consequence, we remanded the case to the Court of the Chancery for adjudication of the remaining counts.

(iv)

On remand, the Court of Chancery "struggle[d]" with the implications of our exculpation holding and, in particular, how it affected the court's post-trial finding that Baker Botts had not rendered its opinion in good faith.[64] Recognizing that we had "plainly reversed the Post-Trial Opinion's finding of an Acceptability Breach . . . and the trial court's ruling on exculpation[],"[65] the Court of Chancery opined that "[w]hat happened to the Opinion Breach presents legitimate grounds for debate."[66] One view—the one favored by the plaintiffs—treats the Opinion Breach as a separate breach not covered by our ruling that the Sole Member's reasonable reliance on Skadden's acceptability opinion resulted in the exculpation of the General Partner. The court labeled this the "Separate Breach View." The Boardwalk defendants, on the other hand, urged the court to view our decision differently; it should be read, the Boardwalk defendants contended, as holding that the General

---

[64] *Remand Opinion*, 2024 WL 4115729, at *35.
[65] *Id.* at *34.
[66] *Id.*

Partner's exercise of the Call Right was not a breach of the Partnership Agreement. This was so, according to the defendants, because our ruling that the General Partner acted in good faith in exercising the Call Right and was therefore exculpated from damages encompassed both the Opinion Breach and the Acceptability Breach. The court saw this argument as embracing two separate readings of our opinion—the "Good Faith View" and the "No Breach View."

In its remand opinion, the Court of Chancery, though expressing uncertainty and allowing that "the justices have a clear sense of what the *Supreme Court Opinion* intended[],"[67] adopted the "No Breach View" and dismissed the remaining counts.

L

In this appeal, Bandera argues that the Court of Chancery misunderstood our 2022 decision and, as a result, erroneously entered judgment in favor of Loews on their tortious-interference and unjust-enrichment claims. Bandera also maintains that the court erred in denying relief on their claim that Boardwalk and the General Partner breached the implied covenant of good faith and fair dealing. It argues, too, that while the General Partner may be exculpated from money damages, "equitable relief remains available" to them.[68] And finally, Bandera challenges the court's

---

[67] *Id.*

[68] Opening Br. at 36.

denial of their claim that the defendants' disclosures distorted the Call-Right exercise price.

## II

The Court of Chancery's interpretation of our 2022 opinion and its effect on the plaintiffs' breach-of-contract claims presents a question of law; as such, we review it *de novo*.[69] "This Court will uphold the trial court's factual findings unless they are clearly erroneous[.]"[70] While a trial court's determination that a party acted in good faith is a legal issue subject to *de novo* review, "the factual findings that provide the basis for that determination will not be overturned unless they are clearly erroneous."[71]

## III

### A

As mentioned above, the Court of Chancery's post-trial opinion rested on the premise that the General Partner's exercise of the Call Right was subject to two separate conditions: the Opinion Condition and the Acceptability Condition. The court concluded that neither of those conditions was satisfied and that the failure of each of these conditions meant that the General Partner breached the Partnership

---

[69] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 38–39 (Del. 2005).
[70] *Gatz Props., LLC v. Auriga Cap. Corp.,* 59 A.3d 1206, 1212 (Del. 2012).
[71] *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101, 108 (Del. 2013).

Agreement by exercising the Call Right. But as explained above, our review of the court's post-trial decision was not co-extensive with these findings. Instead, in our 2022 decision, we concluded that "the Sole Member . . . reasonably relied on the Skadden Opinion to cause the call right exercise. Thus, the General Partner is presumed to have acted in good faith and is immune from damages."[72] We did not address what the Court of Chancery called the Opinion Condition. The Court of Chancery read our 2022 opinion differently, concluding that it "resolved all aspects of the breach of contract claim."[73] As we have noted, the court labeled this the "No Breach View." And in the absence of a breach, the court was, it thought, constrained to dismiss the plaintiffs' tortious interference claim against Loews.

It is true, as the Court of Chancery observed, that we intended our exculpation ruling to "put the breach of contract claim [i.e., Count I] to rest,"[74] at least with respect to a damages award against the General Partner and Boardwalk. True, also, that we "believed the breach of contract claim was over,"[75] again, at least as to damages. But the breach of contract claim was "put to rest" and "over" because we determined that the only party who, under the Court of Chancery's partial judgment, was found liable in damages was exculpated. Simply put, we did not—because it

---

[72] *Boardwalk* 2022, 288 A.3d at 1119.
[73] *Remand Opinion*, 2024 WL 4115729, at *37.
[74] *Id.*
[75] *Id.*

was unnecessary to our determination of the exculpation issue—rule on whether the Opinion Condition had failed and whether that failure caused the General Partner to breach the Partnership Agreement.[76]

A review of our opinion bears this out. In the opinion's introduction, we expressly noted that, beyond the exculpation issue, "[w]e do not address any other arguments on appeal."[77] In a similar way, we noted that the proper focus for General Partner liability "was on the Sole Member and the opinion it received from Skadden."[78] We concluded that "[h]aving reasonably relied on Skadden's advice, the General Partner, through its Sole Member, is conclusively presumed to have acted in good faith and is exculpated from damages."[79] The Court of Chancery's conclusion was erroneous that, by so holding, we had—albeit implicitly—"resolved all aspects of the breach of contract claim," including whether the alleged failure of the Opinion Condition resulted in a breach of the Partnership Agreement.

The law of the case doctrine "prohibits courts from revisiting issues previously decided, with the intent to promote 'efficiency, finality, stability and respect for the judicial system.'" It operates "when a specific legal principle is applied to an issue presented by facts which remain constant throughout the

---

[76] *See PDK Lab'ys v. United States Drug Enf. Admin.,* 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) (citing "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more. . . . ").

[77] *Boardwalk* 2022, 288 A.3d at 1088.

[78] *Id*. at *1123.

[79] *Id*.

subsequent course of the same litigation."  But the law of the case doctrine "only applies to issues the court actually decided."[80]  Among the issues we declined to address was whether the Court of Chancery "erred as a matter of law and fact when it found the Baker Botts Opinion was not issued in good faith[.]"[81]  Limiting our decision to whether the General Partner was liable for damages for breaching the Call Right provisions—an issue sufficient to reverse the Court of Chancery's partial judgment—left several questions in the first appeal unanswered.  They include:

(1)     Did the Court of Chancery apply the wrong standard of review to the Baker Botts opinion when it determined that counsel did not render the opinion in good faith?

(2)     Did the Court of Chancery correctly interpret the Partnership Agreement when it concluded that "exercising the Call Right involved three steps: (1) satisfying the Opinion Condition, (2) satisfying the Acceptability Condition, and (3) making the decision to exercise[]"?

(3)     Were the factual findings underpinning the Court of Chancery's determination that the Baker Botts opinion was not rendered in good faith clearly erroneous?

The answers to these questions, which we take up next, support our ultimate conclusion in this appeal that the General Partner failed to satisfy the Opinion Condition, which meant that the General Partner breached the Partnership Agreement when it redeemed the units.

---

[80] *State v. Wright*, 131 A.3d 310, 321 (Del. 2016) (quoting *John B. v. Emkes*, 710 F.3d 394, 403 (6th Cir. 2013)).
[81] *Boardwalk* 2022, 288 A.3d at 1088.

41

B

In this appellate round, the plaintiffs argue that the Court of Chancery's "No Breach View" misapplied our 2022 opinion, which in turn caused the court to err further by dismissing their tortious-interference claim. The Boardwalk defendants counter that there was only one precondition to the exercise of the Call Right—that the General Partner secure "a written opinion of counsel . . . acceptable to the General Partner" that Boardwalk's partnership tax status "has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers."[82] Put another way, the Boardwalk defendants reject "the trial court's original tripartite conception of Section 15.1(b)"[83] with its three steps: satisfaction of the Opinion Condition; satisfaction of the Acceptability Condition; and the decision to exercise. On this point, we agree with the plaintiffs and conclude that the Court of Chancery's conception of Section 15.1(b) as reflected in its post-trial decision was correct. Our reasons follow.

(i)

We begin our discussion by noting that the Boardwalk defendants' position on this issue has evolved during litigation. To be sure, they have not previously— at least not in this Court—explicitly endorsed the Court of Chancery's initial three-

---

[82] Answering Br. at 14 (quoting App. to Opening Br. at A1218, A1305 (LPA §§ 1.1, 15.1(b))).
[83] *Id*. at 16.

42

step analysis of the Call Right exercise. Yet their challenge to the court's post-trial treatment of the Baker Botts opinion expressly acknowledged that "[t]he opinion had . . . to be rendered in counsel's subjective good faith, 'based on [its] expertise as applied to the facts of the transaction.'"[84] In support, they cited *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, a 2016 Court of Chancery decision we later affirmed. They now take a contrary view—that the opinion need not be rendered in good faith.[85] As explained below, their change of position exposes the unreasonableness of their unitary reading of Section 15.1(b).

(ii)

Bandera argues—and we agree—that the Boardwalk defendants' current reading of Section 15.1(b) and the corresponding "No Breach View" adopted by the Court of Chancery are inconsistent with *Williams*.[86] In *Williams*, the issue of "primary importance"[87] was a condition precedent to the consummation of a merger: an opinion by the acquiror's counsel that a specific transaction encompassed in the merger should be treated by the tax authorities as a tax-free exchange. As things happened, the acquiror's counsel concluded that it could not issue the opinion, which

[84] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund, LP,* Del. 2022*,* No. 1, 2022, D.I. 12; Opening Br.at 29 (quoting *Williams Cos. Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *11 (Del. Ch. June 24, 2016) *aff'd*, 159 A.3d 264 (Del. 2017)).
[85] Oral Argument at 21:40, *Bandera Master Fund, LP v. Boardwalk Pipeline Partners, LP,* (No. 439, 2024), https://vimeo.com/1096285871?fl=pl&fe=vl.
[86] Opening Br. at 22.
[87] *Williams*, 2016 WL 3576682, at *1.

would allow the acquiror, who had soured on the merger, to terminate the merger agreement. The target, however, contended that the acquiror's counsel's conclusion that it could not issue the opinion was "for reasons other than its best legal judgment—that is, that [counsel] acted in bad faith."[88] To address this contention the Court of Chancery observed that it was counsel's "subjective good-faith determination that is the condition precedent[]."[89] And to meet this good-faith standard, counsel must, according to the court apply its "independent expertise . . . to the facts of the transaction."[90]

In its post-trial opinion here, the court repeated the *Williams* standard but also relied on this Court's holding in *Gerber v. Enterprise Products Holdings,., LLC* that a general partner violated the implied covenant of good faith and fair dealing by relying on an opinion "that did not fulfill its basic function."[91] The court then bolstered the *Williams* and *Gerber* principles by citing various secondary authorities for what it viewed as "self-evident manifestations of what it means for an opinion giver to act in subjective good faith."[92]

We agree with the Court of Chancery's statement of the standard for assessing whether an opinion of counsel that serves as a condition precedent to a contractual

---

[88] *Id*. at *11.
[89] *Id*.
[90] *Id*.
[91] *Post-Trial Opinion*, 2021 WL 5267734, at *53 (citing *Gerber v. Enter. Prod. Hldgs., LLC*, 67 A.3d 400, 422 (Del. 2013)).
[92] *Id*. at *53 n.16.

right or obligation is given in good faith. It is consistent, in our view, with customary opinion practice, in which "the lawyer's duty is to provide a fair and objective opinion."[93] Nor did the Boardwalk defendants argue for a different standard when they appealed the Court of Chancery's 2021 partial final judgment. Indeed, as mentioned above, Boardwalk contended that the court did not faithfully apply *Williams* in its post-trial decision. But it did not contest—indeed, it explicitly acknowledged—that *Williams* applied and that the Baker Botts Opinion "had . . . to be rendered in counsel's subjective good-faith, 'based on [its] independent expertise as applied to the facts of the transaction.'"[94] The Boardwalk defendants' current position—that so long as a critical opinion of counsel is followed by a second opinion deeming the first one to be "acceptable," the first opinion need not have been issued in good faith—is, as we see it, an unacceptable end run around *Williams*.

(iii)

In our 2022 opinion, we described the Opinion Condition as a "meaningful limitation" on the General Partner's exercise of the Call Right, separate and apart from the Acceptability Condition.[95] We stand by that statement. And for the

---

[93] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 95, Comment c AM. L. INSTIT. (2000). We recognize that the excerpts from the Restatement quoted here are taken from a section devoted to evaluations undertaken for a third person and not, as here, the lawyer's client. We see no legal reason why these principles should not apply with equal force when a lawyer renders an opinion that affects the economic interests of nonclients who have no role in the opinion process.

[94] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP,* Del. 2022, No. 1, 2022, D.I. 12, Corrected Opening Br. at 29.

[95] *Boardwalk 2022*, 288 A.3d at 1116 n.256.

45

Opinion Condition to operate as a "meaningful limitation" affording a measure of protection for Boardwalk's limited partners, the Opinion of Counsel must pass muster standing on its own two feet. That protection would be toothless if an opinion of counsel delivered in bad faith could trigger the Call Right so long as a second opinion, like Skadden's here, opines not on the merits of counsel's opinion but only on its acceptability.

Here, the Court of Chancery determined that the Baker Botts opinion could not stand on its own and that, in consequence, the General Partner's exercise of the Call Right breached the Partnership Agreement. This determination is based, in our view, on a sound interpretation of Section 15.1(b) of the Partnership Agreement.[96]

(iv)

In the 2022 appeal, the Boardwalk defendants' challenge to the Court of Chancery's post-trial determination that the Baker Botts opinion was not rendered in good faith was three-fold. First, they argued that, by accusing Baker Botts of "relying on a contrived 'syllogism' and 'counterfactual assumptions,' and then 'stretching' to an MAE," the court deviated from the plain language of the

---

[96] Bandera has also asserted a claim for breach of the implied covenant of good faith and fair dealing. Specifically, Bandera contends that "to the extent Defendants complied with the literal terms of Section 15.1(b)(ii), the implied covenant precludes them from benefiting from their corruption of the opinion process." Opening Br. at 34. In light of our agreement with the Court of Chancery that the General Partner's exercise of the Call Right breached the Partnership Agreement, a review of Bandera's implied-covenant claim is unnecessary.

46

Partnership Agreement, reviewed the record unfairly, and drew insupportable inferences in the plaintiffs' favor.

As to the first of these critiques, as we have said earlier, we are satisfied that the Court of Chancery identified the correct standard—the *Williams* standard—by which to assess the Baker Botts opinion. As to the court's interpretation of the record, the inferences it drew from the evidence, and its credibility determinations, we view the Boardwalk directors' complaints as questioning the trial court's factual findings. We in the majority are not persuaded that its factual findings are clearly erroneous.

As an initial matter, it bears emphasis that the Court of Chancery's factual findings rested, in significant part, on a "key credibility determination"[97]—whether Rosenwasser testified credibly. In its Remand Opinion, the court catalogued the topics on which Rosenwasser failed to testify credibly on both "little things" and "big things."[98] It serves no purpose here to recite each instance in which the trial court questioned Rosenwasser's veracity. It is enough to say that the instances were numerous, and that the court's assessment of Rosenwasser's credibility was unmistakably negative. On appeal, this Court does not question such credibility findings.

---

[97] *Remand Opinion*, 2024 WL 4115729, at *19.
[98] *Id*.

47

With that in mind, we conclude that the following factual findings are supported by competent evidence in the trial record.

### 1. Baker Botts knew that Boardwalk's executives did not believe that the March 15 FERC actions were final.

The trial court observed that, "[w]hile Baker Botts was working on a legal opinion that treated the NOPR and other March 15 FERC Actions as final, Boardwalk's management team filed public comments on the NOPR, consistent with the fact that it was not final."[99] Among those comments, of which Rosenwasser was clearly aware, was the statement that "[u]ntil the Commission provides a final decision on the treatment of ADIT, Boardwalk cannot correctly assess the impact of the Revised Policy Statement and ADIT on its pipelines' costs of service, and any response in the Form No. 501-G will be misleading and inaccurate." [100] Additionally, Rosenwasser was keenly aware of other comments by Boardwalk that either clashed with or were ignored by the Baker Botts opinion. They included that: the Policy Statement was "not a binding rule;" FERC instructions for the completing the Form 501-G were improper single-issue ratemaking; and Boardwalk's "fixed negotiated rate agreements" would apply without regard to the pipelines' maximum applicable rates.[101]

---

[99] *Post-Trial Opinion*, 2021 WL 5267734, at *36.

[100] *Id*. at *37 (quoting JX 1130 at 13–15); App. to Opening Br. at A1435 (JX 1138 at 14).

[101] *Post-Trial Opinion*, 2021 WL 5267734, at *38 (citations omitted); App. to Opening Br at A1433–A1437 (JX 1138 at 2-16).

2. **Boardwalk knew that "it was 'misleading' to equate a change in the cost of service stemming from the removal of the income tax allowance with a 'rate reduction,' because a cost-of-service change has 'little bearing' on whether a rate reduction will occur."[102]**

This is supported by Boardwalk's public comments on FERC's NOPR, which

stated:

> Line 33 of Page 1 of the proposed Form No. 501-G is labeled the "Indicated Rate Reduction," and provides the results from completing the Form's first page. This label is misleading and, if not modified, would have the potential to adversely affect Boardwalk. Within 48 hours of the issuance of the NOPR, Boardwalk began receiving calls inquiring about the impact of "Indicated Rate Reduction" set forth on the Form No. 501-G. Yet, Line 33 does not actually represent a promised or indicative rate reduction. *It shows only the potential modifications to a pipeline's cost of service due to tax policy changes, and without regard for changes that may occur to a pipeline's billing determinants, discount adjustments, and other issues impacting recourse rates. In essence, Line 33 provides a cost-of-service number in a vacuum that has little bearing on what the ultimate recourse rate reduction, if any, would occur on the subject pipeline.* As the Commission recognizes in the NOPR, pipelines are not required to reduce rates based only on a single rate component, such as taxes. The Line 33 label appears to provide for impermissible piecemeal ratemaking.[103]

Rosenwasser made handwritten notes on a paper copy of these comments,

underlining the statement that "Boardwalk cannot correctly assess the impact of the

---

[102] *Post Trial-Opinion*, 2021 WL 5267734, at *64 (citing JX 1138 at 30); App. to Opening Br. at A1451 (JX 1138 at 30).

[103] App. to Opening Br. at A1451 (JX 1138 at 30) (emphasis added).

Revised Policy Statement and ADIT on its pipelines' cost of service, and any response in the Form No. 501-G will be misleading and accurate."[104]

3. **"Baker Botts . . . considered real world effects [of the proposed policy change] when doing so helped reach the result that its client wanted, but not when doing so might cut in the opposite direction."[105]**

This is broadly supported by Rosenwasser's statement that, "This is a legal opinion independent of what's happening in mkt. Not a primarily factual analysis."[106] More specific instances abound; the final opinion explicitly assumed that Boardwalk's subsidiaries would be able to charge recourse rates, when Baker Botts knew that most Boardwalk's rates consisted of either discounted or negotiated rates. At various points in the drafting process, Baker Botts attorneys, including FERC expect Wagner, struggled with the uncertainty and importance of ADIT, while Boardwalk and Loews internally acknowledged its significance. Yet no mention was made of ADIT in the final opinion.

4. **"Baker Botts had Boardwalk prepare the Rate Model Analysis[,] . . . [which] was designed to 'get us where we need to go.'"[107]**

This finding—that the Rate Model Analysis was result-oriented—is supported by:

[104] *Post-Trial Opinion*, 2021 WL 5267734, at *36 (citing JX 1130 at 14).
[105] *Id.* at *65.
[106] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11, App. to Opening Br. at A3702 (JX 646 at 3).
[107] *Post-Trial Opinion*, 2021 WL 5267734, at *65 (quoting JX 713 at 1); App. to Opening Br. at A438.

(1)    Johnson's email submitting his Rate Model Analysis, which advised that the analysis would "get us where we need to go,"[108] and

(2)    The inconsistency between assumptions made in Johnson's analysis and Boardwalk's simultaneous lobbying. The analysis assumed under the Reverse South Georgia method that FERC would amortize ADIT, while Boardwalk knew that the treatment of ADIT was an unsettled issue and lobbied through the Interstate Natural Gas Association of America for the elimination of ADIT balances.[109]

## 5.  "The Rate Model Analysis departed from ratemaking principles."[110]

This finding is supported by FERC expert Barry Sullivan's deposition testimony pointing to the flaws in Johnson's Rate Model Analysis.[111]  According to Sullivan, the Rate Model was "not a recourse rate calculation" as it subtracted the income tax allowance from a cost-of-service calculation to arrive at, in Johnson's words, an "indicative rate."[112]  This theory, that a decrease in tax expenses indicates a decrease in cost of service, was described by Boardwalk executives in a different setting as a "train wreck"[113]  As to Johnson's overall description of his own work,

---

[108] App. to Opening Br. at A438.

[109] *Post-Trial Opinion*, 2021 WL 5267734, at *46 (citations omitted).

[110] *Id*.

[111] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11 at A5558 (Sullivan Dep.).

[112] *Id*.

[113] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B321 (McMahon emails).

i.e., that he had calculated "indicative rates," Sullivan testified that "an indicative rate doesn't mean anything" and that FERC's ratemaking process considers a number of important factors beyond solely a change in income tax allowance.[114]

**6. "Baker Botts had to stretch to render the Opinion[] . . . .[reaching] strained conclusions [that were] signs of motivated reasoning."[115]**

This finding is supported by, among other things, Baker Botts' struggles with and manipulation of the material-adverse-effect standard. Richards Layton believed that a 12-13% declines in rates would likely constitute a material adverse effect. Skadden attorneys believed that 11% was "likely insufficient." Yet the final opinion saw Baker Botts claim that "an estimated reduction in excess of ten percent" would generate a material adverse effect.[116] The Rate Model Analysis predicted an 11.68% decline in indicative rates for Texas Gas, forcing the Baker Botts opinion to fall below the numbers provided by Richards Layton.[117] Baker Botts was also unsure of the meaning of the phrase "reasonably likely to have a material adverse effect."[118] Rosenwasser "decided to 'call it more likely than not.'"[119]

**7. "Baker Botts rendered a non-explained opinion on a complex issue of Delaware law [i.e., the material adverse effect" issue] that the two Delaware law firms who were consulted would not formally address.**

---

[114] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11 at A5558 (Sullivan Dep.).
[115] *Post-Trial Opinion*, 2021 WL 5267734, at *67; App. to Opening Br. at A511.
[116] App. to Answering Br. at B1013 (JX 1522 at 3) (Baker Botts Opinion).
[117] *Id.*
[118] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B3384 (JX 1807 at 12).
[119] *Post-Trial Opinion*, 2021 WL 5267734, at *67 (quoting JX 1807 at 12).

**And Baker Botts did so in the face of fatal uncertainty that could have been mitigated simply by waiting."[120]**

The opinion took the form of a routine opinion and did not cite cases or legal authorities to support the various positions it took. Throughout the drafting process, Baker Botts pushed past the hesitancy expressed by lawyers from both Richards Layton and Skadden. On July 18, 2018, hours after the transaction closed, FERC provided final rulings on the income tax allowance and ADIT issues. Limited partnerships would be allowed to argue in rate case proceedings for an income tax allowance, and those that did not recover an income tax allowance would be able to eliminate their ADIT balances entirely.[121] The July 18, 2018 announcements resolved the outstanding questions, the uncertainty of which undermined the logic of the Baker Botts opinion. Had Baker Botts waited, as of July 18, 2018, the impact of the income tax allowance and ADIT policies on Boardwalk could have been accurately assessed.

8. **Baker Botts knew that the March 15 FERC Actions were not reasonably likely to have a material adverse effect on Boardwalk's recourse rates.[122]**

---

[120] *Id*. at *68; *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B559 (JX 771 at 1), B1123 (JX 975 at 1).

[121] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 11 at A5391 (JX 1549 at 3–4).

[122] *Post-Trial Opinion*, 2021 WL 5267734, at *58; *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B1126 (JX 1007 at 1).

A Baker Botts partner's notes taken during the opinion-writing process support this finding. The notes, which read "no effect–screw min," could reasonably be read to mean "no effect–screw minority[,]" likely reflecting the partner's understanding that the March 2018 Actions would have little effect on Boardwalk's rates, but that the Baker Botts opinion would still allow for Call Right exercise. Loews executives came to a similar conclusion during the drafting process, stating, "If people think the language says that the relevant test is what is the real-world effect, then we have an issue. I think it's crystal clear that we're talking hypothetical future max FERC rates."[123]

9. **"The timing of the Opinion points in the same direction. Given the non-final nature of the Revised Policy, the avalanche of comments that FERC received, the direct linkage between the Revised Policy and the ADIT NOI that Boardwalk itself identified, and the uncertainty regarding the treatment of ADIT, Baker Botts could not have believed in good faith that it could render the Opinion before FERC provided further guidance. There were too many known unknowns. And an opportunity for clarity of these unknowns was on the horizon: FERC was likely to provide more guidance at its meeting on July 19, 2018. Baker Botts needed to wait."[124]**

The Notice on Proposed Rulemaking was a proposed rule. The NOPR requested comments from industry participants, in anticipation of further changes that FERC might make to the proposed rule.[125] The importance of the ADIT issue

---

[123] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B1035 (JX 798).
[124] *Post-Trial Opinion*, 2021 WL 5267734, at *69.
[125] *Id.* at *13; *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B347 (JX 580).

as the "a-bomb outcome" for Boardwalk, and the high level of uncertainty regarding the ultimate disposition of that issue ("[T]he effect on ADIT is unknown & unknowable"),[126] support a finding that Baker Botts knew ADIT was a crucial unknown throughout the drafting process. The court's finding that Baker Botts should have waited is supported further by an e-mail Naeve, the Skadden partner and former FERC Commissioner, sent to a colleague on the day Baker Botts delivered its preliminary opinion. In that e-mail, Naeve discussed the uncertainty surrounding how FERC would respond to industry comments and observed that "[i]f I were Baker Botts I would prefer to wait until FERC acts on the comments."[127]

> **10. "Rosenwasser had an additional, personal incentive to push the limits. He drafted the Call Right, and he understandably wanted that provision to accomplish what his client thought it should do. And Loews was a forceful client."[128]**

Baker Botts' engagement letter noted that Rosenwasser had drafted the Call Right provision in 2005, but Baker Botts concluded that his 2005 work was not "substantially related" to the exercise of the Call Right, at least from a conflicts-of-interest perspective.[129] Delaware precedent and applicable treatises hold that legal matters arising from a document are substantially related to that document.[130]

---

[126] *Boardwalk Pipeline Partners, L.P., v. Bandera Master Fund LP, Del. 2022,* Del. 2022, No. 1, 2022, D.I. 19 at B3387 (JX 1807 at 3-4), B464 (JX 601 at 2).

[127] App. to Opening Br. at A1385 (JX 1076).

[128] *Id.*; *see also id.* at A403.

[129] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, Del. 2022, No. 1, 2022, D.I. 19 at B1057 (JX 906 at 2).

[130] *Post-Trial Opinion*, 2021 WL 5267734, at *69 n.25.

This is not an exhaustive treatment of the factual findings the trial court relied upon in reaching its conclusion that the Baker Botts opinion was a product of "a contrived effort to generate the client's desired result"[131] and not a subjective good-faith determination of the issue at hand. Nor do we think that each factual finding the trial court made was dictated by the evidence. Often, there can be two permissible views of evidence. But when that is the case, "the factfinder's choice between them cannot be clearly erroneous."[132] It suffices here that these findings, none of which we see as clearly erroneous, are sufficient to support the Court of Chancery's factual determinations and therefore its legal conclusion.

C

We turn next to the Court of Chancery's dismissal of Bandera's tortious-interference-with-contractual-relations claim against Loews. Because the court adopted the "No Breach View" of our 2022 opinion and, under that view, exercising the Call Right did not breach the Partnership Agreement, the court entered judgment for Loews on the tortious-interference claim. As explained earlier, we disagree with the Court of Chancery's "No Breach View" of our 2022 opinion. We also concluded that the court applied the correct legal standard in its post-trial determination that, because the Opinion Condition was not satisfied, the General Partner's exercise of

---

[131] *Id.* at *71.
[132] *Bank of N.Y. Mellon v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

the Call Right breached the Partnership Agreement and that the factual findings underpinning that determination were not clearly erroneous. Because these holdings undermine the reasoning upon which the Court of Chancery entered judgment for Loews on Bandera's tortious-interference claim, we reverse that judgment.

Recognizing, however, that its reading of our 2022 opinion may have "misse[d] the mark (and in hopes of avoiding another remand),"[133] the Court of Chancery analyzed the claim under the two alternative views—the "Good Faith View" and the "Separate Breach View." The court concluded that "[u]nder the No Breach View, Loews prevails. Under the Good Faith View, the question is closer, but Loews again prevails. Under the Separate Breach View, the plaintiffs prevail."[134]

We appreciate the Court of Chancery's analysis of the tortious-interference claim under the two alternative views of our 2022 opinion. Likewise, we appreciate the court's desire to avoid another remand. But our remit in this appeal is to review the judgment on appeal and not the judgment the trial court might have entered under alternative analyses—a hypothetical judgment that has not been appealed. We believe that to pass upon those portions of the trial court's analysis that explicitly did not form the basis for the judgment it entered is unwise and unfair to the parties,

---

[133] *Remand Opinion*, 2024 WL 4115729, at *37.
[134] *Id*. at *38.

whose focus in briefing and at oral argument in this Court has been on the judgment as entered. A remand, however unwelcome the trial court might find it, is thus required for the court to consider anew Bandera's tortious-interference count and defenses to recovery under that theory.

D

The plaintiffs argue next that, despite our decision in 2022 that the General Partner is exculpated from damages under Count I of the complaint, all equitable remedies against the General Partner remain available, including rescission, imposition of a constructive trust, and disgorgement. They also press the claim that, although the Partnership Agreement's exculpatory provisions might protect the General Partner, the other defendants have not shown that they qualify for exculpation.

We are unpersuaded by the plaintiffs' argument that the court can yet assess rescissory damages or other monetary payments against the General Partner under equitable theories. We reiterate that Section 7.8(a) of the Partnership Agreement exculpates the General Partner "for monetary damages." The exculpatory provision does not limit its reach to damages as a legal remedy. Nor did the plaintiffs draw a distinction between legal and equitable remedies in the operative complaint. Instead, they sought "all available damages, including rescissory damages, unjust

enrichment, and disgorgement, for Defendants' breaches of contract[.]"[135] Their effort now to impose financial liability on the General Partner, unsupported by any precedent, runs contrary to our 2022 decision that the General Partner was exculpated from monetary damages for breach of contract.[136]

We agree with the plaintiffs, however, that our 2022 decision did not address whether defendants other than the General Partner were exculpated. And because of its adoption of the No Breach View of our decision and its consequent dismissal of the remaining counts, neither did the Court of Chancery on remand. It may, to the extent necessary, do so now.

E

Finally, Bandera contends, separate from their claims arising from the Defendants' exercise of the Call Right, that the Defendants distorted the Call Right exercise price by using the Potential Exercise Disclosures to game the Call Right's pricing mechanism in the Partnership Agreement. This claim, which appears under Counts II and V of the operative complaint, alleges that the Boardwalk defendants were unjustly enriched when they purchased the limited partners' common units at an artificially depressed price.

---

[135] App. to Answering Br. at B531.
[136] *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 541 (Del. 1996) (denying plaintiff's request for a remand for determination whether there were any "'equitable remedies' that do not constitute 'monetary damages'" and reading an earlier decision in the case that directors were free from personal liability under 8 *Del. C.* § 102 (b)(7) to apply "whether monetary damages arise out of legal or equitable theories").

The Partnership Agreement provided that the Call Right's exercise price would be determined using a 180-day look-back formula. Specifically, the Call Right exercise price was to be calculated as "the average of the daily Closing Prices per Limited Partner Interest of such class for the 180 consecutive Trading Days immediately prior to [three days before notice is mailed that GP or one of GP's affiliates elects to exercise the Call Right]."[137] On April 30, 2018, Loews issued an SEC form 10-Q disclosing that it was "analyzing the FERC's recent actions and seriously considering the purchase right under the partnership agreement in connection therewith."[138] Similarly, Boardwalk's 10-Q, issued in tandem with the Loews filing, informed holders of limited partnership interests that "our general partner has a call right that may become exercisable because of recent FERC action"[139] and that Loews, through the Sole Member, had informed Boardwalk that it was "seriously considering its purchase right."[140]

Although Boardwalk's trading price initially jumped on the news of a possible take-private transaction, as the consequences of the 180-day look-back formula for calculating the Call Right exercise price became apparent to public investors, Boardwalk's unit price declined steadily. As Boardwalk's unit price fell, so too did

---

[137] App. to Opening Br. at A1305 (Partnership Agreement § 15.1(b)).
[138] *Id.* at A1461 (Loews April 30, 2018 10-Q).
[139] *Id.* at A1493 (Boardwalk April 30, 2018 10-Q).
[140] *Id.*

the exercise price as calculated under the Partnership Agreement's backward-looking formula. Loews knew that this would be the case and that the longer it waited to exercise the Call Right after disclosing it was considering doing so, the lower the exercise price would be.

Making the Potential Exercise Disclosures in this manner, according to Bandera, violated the Partnership Agreement in two ways. First, plaintiffs allege that the Potential Exercise disclosures violated Section 7.9(a) of the Partnership Agreement which concerns the resolution of conflicts of interest between the General Partner and its affiliates, and the Partnership. To be permissible and avoid breach of the Partnership Agreement, the resolution of a conflict must be "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved."[141] The outcome here was not "fair and reasonable[,]" Bandera argues, because the Potential Exercise disclosures were "misleading and impacted the exercise price in Defendants' favor at the limited partners' expense."[142] In Bandera's view, although they concede that some form of disclosure was required under federal securities law, the disclosures as drafted omitted material information such as

---

[141] App. to Opening Br. at A1278 (Partnership Agreement § 7.9(a)). The plaintiffs do not argue that any of the other permissible methods for resolution of a conflict under § 7.9(a) apply in this case.

[142] Opening Br. at 45.

- language indicating that FERC's cost-of-service ratemaking principles might result in a net increase in Boardwalk's rates, depending on how the March 15 FERC Actions were ultimately resolved;

- information confirming that Loews had retained counsel to examine these issues and had obtained commitments regarding the issuance and acceptability of the opinion;

- key details concerning the favorable implications of the NOPR, as well as the importance of rate case risk in assessing the likelihood of any adverse rate impact; and

- the fact that requests for rehearing raised substantial uncertainty regarding whether and how FERC might apply the Revised Policy to Boardwalk's subsidiaries in the future.[143]

These omissions from each entity's 10-Q filings and contemporaneous earnings calls, according to Bandera, "left investors in the dark on Loews' intentions" and set in motion a "fear feedback loop" that depressed the price of Boardwalk's limited partner interests.[144]

The Court of Chancery summarily rejected this argument. It first concluded that the additional information that the plaintiffs cite was not material. And taking for granted the fact that the Potential Exercise Disclosures presented a conflict of interest, the court concluded that the General Partner's resolution of the conflict—issuing the disclosures—was fair and reasonable to the partnership because the disclosures were required under federal securities law. In the court's words, "[b]y

---

[143] *Id.* at 42.
[144] *Id.* at 42–43.

providing the disclosures required by law, the General Partner fulfilled that obligation."[145]

We agree with the Court of Chancery's conclusion. Assuming that the decision to issue the Potential Exercise Disclosures presented a conflict of interest for the General Partner, our only task is to determine whether the General Partner's resolution of the conflict was fair and reasonable to the partnership. Because the plaintiffs concede that some form of Potential Exercise Disclosure was required by federal securities law, their claim rests solely on the content of those disclosures. We cannot see how any of the omissions that the plaintiffs cite were material such that the exercise price would have meaningfully changed had they been disclosed in Loews' and Boardwalk's 10-Q filings.

For one, much of the information that Bandera claims should have been disclosed was disclosed or was otherwise already public, including that (i) Boardwalk did "not expect [FERC's Revised Policy Statement, NOI and NOPR] to have a material impact on our revenues in the near term";[146] (ii) that the prevalence of "negotiated or discounted rate agreements" for two of Boardwalk's three subsidiaries and a rate "moratorium" for the third mitigated any near-term adverse

---

[145] *Id.*
[146] App. to Answering Br. at B738.

63

impact;[147] and (iii) that "[r]equests for rehearing and clarification" had been filed with FERC.[148]

The plaintiffs also contend that the Potential Exercise Disclosures violated the Partnership Agreement because the formula for calculating the Call Right exercise price in Section 15.1(b) contemplated ensuring that the price was not skewed by notice of the Call Right exercise itself. The three-day window that the agreement establishes between the beginning of the look-back period and notice of the Call Right exercise was intended to insulate the Call Right exercise price from any market response to notice of the General Partner's intent to trigger the Call Right. The Potential Exercise Disclosures, Bandera alleges, upended this contractual design by prompting a negative market response to the disclosure that the General Partner was "strongly considering" exercising its Call Right. Bandera contends that under Section 16.2 of the Partnership Agreement, which prevents the General Partner and its affiliates from "tak[ing] or refrain[ing] from taking action as may be necessary or appropriate to achieve the purposes of"[149] the Partnership Agreement, the Potential Exercise Disclosures should be viewed as an attempt to subvert the calculation contemplated by Section 15.1(b) by depressing Boardwalk's unit price, and,

---

[147] *Id.*
[148] *Id.* at B1048–49.
[149] App. to Opening Br. at A1508–09.

accordingly, their publication should be considered a breach of the Partnership Agreement.

This theory of breach, too, fails. As we have discussed, none of the omissions that the plaintiffs urge us to consider were material. And Section 15.1(b) does not contemplate disclosure requirements. The calculation methodology mandated by that provision is intended to insulate the exercise price from the decision to exercise the Call Right itself. The fact that this contractual scheme exists does not prohibit Loews or the General Partner from making public disclosures that the Call Right *might* be exercised at some point in the future. Lastly, under these facts, there is no contractual gap in which the implied covenant of good faith and fair dealing can operate. The provision at issue makes no mention of disclosures, and to read Sections 15.1(b) and 16.2 as creating a contractual scheme that would prohibit Boardwalk from making disclosures required by federal law cannot be the meaning that the parties intended. Because we determine that the Potential Exercise Disclosures did not breach the Partnership Agreement, the plaintiffs' claims that the Potential Exercise Disclosures constituted tortious interference by Loews, the GPGP, and the Sole Member, must fail.

IV

For the reasons set forth above, we affirm the judgment of the Court of Chancery in the defendants' favor on Count II (breach of contract arising from the

65

Potential Exercise Disclosures), Count III (breach of the implied covenant of good faith and fair dealing), and Count V (unjust enrichment). We reverse the judgment of the Court of Chancery in the defendants' favor on Count IV (tortious interference with contractual relations) and remand for further proceedings consistent with this opinion. Jurisdiction is not retained.

**LEGROW, J. dissenting, joined by VALIHURA, J.:**

In its 2021 post-trial opinion, the Court of Chancery held that Boardwalk's General Partner breached the Partnership Agreement by exercising the Call Right without satisfying two of the contractual conditions to that right: the Opinion Condition and the Acceptability Condition.[150] On appeal, the defendants challenged both holdings. In 2022, a majority of this Court held that the General Partner did not breach the Acceptability Condition and that, having reasonably relied on Skadden's advice, the General Partner, through the Sole Member, was exculpated from damages under the Partnership Agreement (the "2022 Opinion").[151] In a concurring opinion authored by Justice Valihura (the "Concurring Opinion"), we agreed with the majority that the General Partner, acting through the Sole Member, was the proper decision maker for purposes of the Acceptability Condition, but we wrote separately to explain our view that the trial court erred in holding that the Opinion Condition was not met.

As we stated at the time, we viewed the trial court's holdings on the Opinion Condition as the "focal point" of the case. Although the majority chose to resolve the appeal without addressing the Opinion Condition, it was unclear to us how the

---

[150] The facts of this case have been set forth in detail in both of the opinions issued by the trial court and in the majority opinions issued in each appeal. We do not repeat the facts here. We adopt the defined terms used in the foregoing majority opinion.

[151] *Boardwalk Pipeline Partners, L.P. v. Bandera Master Fund LP*, 288 A.3d 1083, 1117, 1123 (Del. 2022) ("*Boardwalk 2022*").

Call Right could be deemed to have been triggered unless the Opinion Condition was satisfied.[152] Justice Valihura explained the analytical challenge created by not addressing the trial court's holdings regarding the Opinion Condition:

> As Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") observed in its opinion, "[a]s a pre-condition to exercising the Call Right, Section 15.1(b)(ii) requires that the General Partner receive an 'Opinion of Counsel,' to the effect that the Partnership's status as a pass-through entity for tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers by the Partnership's subsidiaries[.]" A5102. Skadden opined that Baker's Opinion conforms to the requisite language in Section 15.1(b). *See* A5110. However, Skadden did not opine on whether there was an MAE. In fact, Skadden stated expressly that "we have not been asked to undertake, and have not undertaken, any analyses for purposes of rendering the Opinion of Counsel contemplated in Section 15.1(b)(ii) of the LPA (*and are not rendering such an opinion*)[.]" A5121 (emphasis added). And because the Majority leaves the findings regarding Baker's Opinion in place, according to my reading of the Majority's opinion, Baker's Opinion did not satisfy Section 15.1(b)(ii), and, thus, a necessary precondition to the exercise of the Call Right was not satisfied.[153]

Now, on appeal from the Court of Chancery's Remand Opinion resolving the remaining counts in the plaintiffs' complaint, our colleagues in the Majority hold that the trial court correctly concluded in 2021 that the General Partner failed to satisfy the Opinion Condition and thereby breached the Partnership Agreement by

---

[152] *Boardwalk 2022* at 1123–24 & n. 1 (Del. 2022) (Valihura, J., concurring). Having concluded that the Opinion Condition and the Acceptability Condition were met, we did not address exculpation. *Id*. at 1123.

[153] *Boardwalk 2022* at 1124, n.1 (Valihura, J., concurring).

68

exercising the Call Right.[154]  Having so concluded, the Majority again remands this case so that the Court of Chancery may address the plaintiffs' tortious interference claim against Loews.

We disagree with our colleagues in the Majority and would affirm the Court of Chancery's Remand Opinion because, in our view, the Baker Botts opinion satisfied the Opinion Condition and the General Partner therefore did not breach the Partnership Agreement by exercising the Call Right once the Acceptability Condition was met.[155]  Justice Valihura explained our position at length in the Concurring Opinion and we will not repeat that analysis in detail here.  Briefly

---

[154] Majority Opinion at 41.

[155] To be clear, and as we explained in the Concurring Opinion, we view the Opinion Condition and the Acceptability Condition as separate requirements, both of which had to be satisfied before the General Partner could validly exercise the Call Right.  *See Boardwalk 2022* at 1124, n.1 (Valihura, J., concurring) (describing the Opinion Condition as a "necessary precondition" to the Call Right).  Because both conditions were satisfied in this case, we would enter judgment for the defendants on Count I.  Our finding that the defendants did not breach the Partnership Agreement effectively resolves most of the plaintiffs' remaining claims, as we explain above.

In its post-remand opinion, the Court of Chancery endeavored to construe and apply the 2022 Opinion to the plaintiffs' remaining claims.  The court identified three possible interpretations of the majority opinion: the "No Breach View," the "Good Faith View," and the "Separate Breach View."  *See Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2024 WL 4115729, at *36–38 (Del. Ch. Sept. 9, 2024) ("Remand Opinion").  The trial court's No Breach View understood the 2022 Opinion as addressing "both bases for breach"—the Opinion Condition and the Acceptability Condition—and resolving all aspects of the breach of contract count in the General Partner's favor.  The court reasoned that the No Breach View was the most plausible reading of the 2022 Opinion, and under that view the defendants prevailed on the plaintiffs' remaining claims.  Remand Opinion at *42, *48–49.  In that sense, the result that our dissent would reach aligns with the Court of Chancery's application of the No Breach View.  But to the extent that the No Breach View collapses the Opinion Condition and the Acceptability Condition, we disagree with that interpretation of the Partnership Agreement.  As we understand it, our colleagues in the Majority also view the conditions as separate, rejecting a "unitary reading" of Section 15.1(b).  *See* Majority Opinion at 42–46.

69

summarized, we concluded in the Concurring Opinion that the trial court misapplied Delaware law by reviewing the Baker Botts opinion *de novo* rather than considering whether counsel issued the opinion in subjective good faith. Although we acknowledged that the factual record was "far from perfect" for the defendants, we held that the trial court improperly substituted its own legal interpretation of the Call Right for opinion counsel's interpretation, and that many of the court's bad-faith findings derived from its imposition of its construction of Section 15.1(b). Reviewing those findings with the appropriate deference to Baker Botts' interpretation of the Partnership Agreement led us to conclude that Baker Botts' conduct did not rise to the level of bad faith. Accordingly, we took the position that the Opinion Condition was satisfied.

That conclusion, coupled with the holding in the 2022 Opinion that the General Partner did not breach the Acceptability Condition, would directly resolve Count I in the defendants' favor. Count IV—the tortious interference claim that the Majority remands to the Court of Chancery—necessarily fails because there is no underlying breach of contract, an essential element of a tortious interference claim.[156] And we agree with our colleagues in the Majority that the record does not

---

[156] *See WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (holding that to prevail in a tortious interference with contract claim, a plaintiff must show "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in *causing the breach of contract*, (4) the act was without justification, and (5) it caused injury") (citing Restatement (Second) of Torts § 766) (emphasis added); *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006)

support the plaintiffs' breach of contract and unjust enrichment claims relating to the Potential Exercise Disclosures.[157]

That leaves only Count III, which alleges that Boardwalk and the General Partner breached the implied covenant of good faith and fair dealing by exercising the Call Right.[158] The plaintiffs' implied covenant claim rests on their contention that the Partnership Agreement "implicitly prevented [the defendants] from intentionally procuring an illegitimate opinion" of counsel to satisfy the Opinion Condition.[159] We disagree and would enter judgment in favor of the defendants for two reasons. First, the implied covenant is a limited, gap-filling remedy that only operates where a contract is silent; it does not apply when a contract "addresses the conduct at issue."[160] Section 15.1(b) expressly identifies the conditions under which the General Partner may exercise the Call Right, leaving no gap for the implied covenant to fill. Second, as set forth above and in the Concurring Opinion, the Baker

---

("To state a tortious interference claim, a plaintiff must properly allege an underlying breach of contract.").

[157] Majority Opinion at 59–65.

[158] Our colleagues in the Majority conclude that a review of the implied covenant claim is unnecessary given their conclusion that the General Partner's exercise of the Call Right breached the Partnership Agreement. Majority Opinion at 46, n.96. Although we agree that the Court of Chancery's judgment in favor of the defendants on this count should be affirmed, we reach that conclusion for different reasons.

[159] Appellants' Opening Br. at 33.

[160] *Oxbow Carbon & Materials Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019); *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015).

Botts opinion was not "illegitimate." For both of those reasons, the plaintiffs' implied covenant claim fails.

In sum, and for the reasons explained in the Concurring Opinion, we would have reversed the post-trial opinion because the General Partner validly exercised the Call Right after both the Opinion Condition and the Acceptability Condition were satisfied. That conclusion effectively resolves the plaintiffs' remaining claims. We therefore would affirm the Court of Chancery's post-remand order entering judgment in favor of the defendants on all the plaintiffs' claims.